IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARRIE UPSHAW,                          )
                                        )
                    Plaintiff,          )
                                        )      No.    05 C 0272
        v.                              )
                                        )      Judge Robert W. Gettleman
AKAL SECURITY, INC. and                 )
SECURITY POLICE AND FIRE                )
PROFESSIONALS OF AMERICA,               )
                                        )
                    Defendants.         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Carrie Upshaw filed a six-count putative class action against defendants Akal

Security, Inc. ("Akal") and the Security Police and Fire Professionals of America ("SPFPA"),

seeking unpaid wages and health and welfare benefits. Count I alleges that defendants

wrongfully withheld wages and health and welfare benefits in violation of § 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185. Count II alleges a quantum meruit

claim in the alternative.[1] Count III alleges that the 401(k) plan is structurally deficient because

employer and employee representatives are not "equally represented" in important decisions

regarding the management of the 401(k) plan, in violation of § 302(c)(5) of the LMRA. Counts

IV, V, and VI allege violations of §§ 403 and 404 of the Employment Retirement Income

Security Act ("ERISA"), 29 U.S.C. §§ 1103, 1104, and 1105, based on the establishment and

maintenance of the 401(k) plan, and defendants' failure to pay health and welfare benefits

directly to employees.

---

[1]Plaintiff's counts are less than a model of clarity, but it appears that Counts I and II are
against Akal only, although Count I references SPFPA's duty of fair representation.

Plaintiff filed her original class action complaint on January 14, 2005, alleging that Akal breached the collective bargaining agreement and § 301 of the LMRA by paying an unlawfully low hourly rate and not paying health and welfare benefits directly to employees. Plaintiff sought a declaratory judgment that defendants must pay a higher hourly rate and pay employees directly $2.59 per hour in health and welfare benefits. The original complaint also alleged a breach of the duty of fair representation by the SPFPA. On July 11, 2005, this court certified by agreement a class for Count I of the second amended complaint pursuant to Fed. R. Civ. P. 23(b)(3) defined as:

> All persons currently or previously employed by Akal Security, Inc. in the collective bargaining unit represented by Local 200 of the Security Police and Fire Professionals of America and who are or were working under the FPS [Federal Protective Services] Region 5 Contract between Akal Security, Inc. and the United States Government to provide security services to federal buildings in Indiana, Wisconsin, Minnesota, and Northern Illinois.

Notice for the Count I class was sent in December 2005, and the deadline for opting out of the class was February 20, 2006.[2] At the time this court granted certification of the Count I class by agreement and approved the class notice, Local 200 covered all employees in all four states.

On October 7, 2005, plaintiff filed a three-count first amended complaint, alleging violations of §§ 301 and 302 of the LMRA, and § 404 of ERISA. The first amended complaint sought, inter alia, to enjoin defendants from "continuing to maintain the unlawful 401(k) plan." The second amended complaint, filed January 6, 2006, adds two more ERISA counts, and alleges, in the alternative, a quantum meruit claim for unpaid wages and benefits if Akal and the putative class members did not have a contract regarding wages and health and welfare benefits.

[2]According to plaintiff, of the 650 notices that were sent, 19 were returned for insufficient addresses, and 11 class members opted out of the lawsuit.

Plaintiff has filed a motion pursuant to Fed. R. Civ. P. 23(b)(3)[3], seeking to certify a

single class for Counts II, IV, V, and VI, defined as:

> All individuals who are or were employees of Akal Security Inc. (Akal) and who
> currently work or worked under the FPS Region 5 Contract (also known as the 4-State
> Security Guard Services Contract) with the United States government to provide security
> services to federal buildings and who are represented by SPFPA.[4]

Plaintiff does not seek certification on Count III.  Defendants oppose the motion to certify the

class for Counts II, IV, V, and VI, and seek to decertify the class for Count I, arguing that

plaintiff fails to satisfy the requirements of Rule 23(a).  For the reasons stated below, plaintiff's

motion for class certification is granted, and defendants' motions to decertify the Count I class

are denied.

## FACTS

The following facts are those relevant to class certification only.

Plaintiff Carrie Upshaw is a resident of Illinois and an employee of defendant Akal.

Defendant Akal employs security guards working at federal office buildings in Illinois, Indiana,

Wisconsin, and Minnesota.  Defendant SPFPA is a labor organization representing plaintiff and

other security guards in the same four states.

---

[3]Plaintiff's second amended complaint seeks certification under Rule 23(b)(3), the same
rule under which the Count I class was certified.  Plaintiff states in her motion for class
certification that she seeks certification under 23(b)(1)(A), 23(b)(1)(B), 23(b)(2), and 23(b)(3).

[4]The proposed class definition in the second amended complaint differs from the
definition of the stipulated class, and plaintiff's motion for class certification proposes yet a third
variation on the class definition.  Plaintiff suggests that the differences are because, subsequent
to filing of the initial complaint and notice to the Count I class, the single bargaining unit of the
SPFPA for the Four State Contract in existence was divided into four distinct locals, one for each
of the four states, in Spring 2005.  This does not, however, explain the differences between the
definition in the second amended complaint and the motion for class certification, or address
how the class definition can be changed after the class has been notified.

Until July 1, 2004, plaintiff and other putative class members worked for the General Security Services Company ("GSSC") and were members of the Independent Security Police Union ("ISPU") under a collective bargaining agreement ("CBA") between GSSC and ISPU. In 2003, the Federal Protective Services ("FPS") took bids for a service contract to provide security services and personnel at various federal facilities. The contract, commonly referred to as the "Four-State Contract," was previously served by GSSC. In June 2004, after GSSC lost its contract with the FPS, but before Akal took over the work, members of ISPU voted by secret ballot to merge into SPFPA. As a result of the merger, members of ISPU became members of SPFPA Local 200, and SPFPA became the collective bargaining representative of the employees under the Four State Contract.

Plaintiff alleges that Akal was required to pay at a minimum wage that was equivalent to the Area Wage Determination set by the United States Department of Labor. According to plaintiff, other security guards working for the federal government with the same job description as plaintiff and other putative class members were paid more than $17.00 an hour for their work from July 1, 2004, through September 30, 2005. Plaintiff alleges that Akal did not increase the pay of plaintiff and putative class members on July 1, 2004, to equal or exceed the pay set by the Area Wage Determination. Defendants sent a letter dated September 16, 2005, after this lawsuit had been filed, stating that any employee earning less than the Area Wage Determination rate as

of July 1, 2004, would receive retroactive pay.[5]  According to plaintiff, class members did not

receive overtime adjustments or interest on the retroactive pay.

Plaintiff alleges that Akal was required to pay a health and welfare allowance directly to

the security officers working on the Four State Contract, as GSSC had previously done, because

Akal either adopted the CBA between GSSC and ISPU, or was bound by GSSC's past practices.

Akal continued the earlier practice of deducting a portion of the wages of employees for health

and welfare benefits, but did not pay these benefits directly to employees.  Plaintiff alleges that

Akal was required to contribute $2.59 per hour for health and welfare benefits, but contributed

less than this amount from July 1, 2004, through October 31, 2005.  According to plaintiff,

employees were denied their right to access their health and welfare benefits at the time they

were paid because they were withheld by defendants.

In early August 2004, Akal sent a check for more than $100,000 to SPFPA, stating that it

was for health and welfare benefits.  SPFPA returned the check, stating that there was no

agreement concerning how they money should be handled.  On August 19, 2004, Akal and

SPFPA's bargaining committee met to discuss how to handle the health and welfare funds.

Plaintiff was present at the meeting as an observer, but was not a member of the bargaining

committee.  Plaintiff testified at her deposition that her preference at that time was "no plan at

---

[5]Paragraph 38 of the second amended complaint also alleges that the September 16 letter "did not state that plaintiff and other class members would receive an increase in health and welfare to meet the $2.59 minimum that other federal security guards were being paid."  The letter, attached to plaintiff's complaint, however, states: "All bargaining unit employees will receive an increase in their Health and Welfare Allowance payments.  The new Health and Welfare rate will be $2.59 per regular hour worked up to 40."  The letter further states the rate will be retroactive to July 1, 2004, and will be effective until September 30, 2005, and that these funds will be paid into SPFPA's 401(k) plan.

all." The bargaining committee voted unanimously to accept the funds on a temporary basis into a 401(k) plan.

SPFPA and Akal entered into an agreement placing the health and welfare funds into SPFPA's Joint Employer 401(k) Trust ("Plan"), which was a multi-employer trust already used by SPFPA with other employers at other locations. In the subsequent CBA, Akal and SPFPA agreed that health and welfare contributions would continue to be paid to the Plan until September 30, 2005, and to employees in cash thereafter.

Starting in September 2004, Akal began making regular deposits to the Plan, including retroactive payments back through July 1, 2004. Defendants assert that each employee received his or her pro-rata share of accumulated interest, but plaintiff alleges that interest was not included. According to SPFPA, because the Plan had to establish individual accounts for each bargaining unit member, the funds were initially placed into a single, interest bearing account. In approximately January 2005, the individual accounts were finalized and each bargaining unit member's account was fully funded back to July 1, 2004. Plaintiff alleges that employees could not access their money until February 2005 due to Akal's failure to provide the correct information to the Plan, and that they were required to pay large fees to withdraw funds. Plaintiff and some other putative class members have withdrawn or are in the process of withdrawing all of their funds from the Plan.

In July and early August 2004, SPFPA and plaintiff each filed unfair labor practice charges against Akal with the National Labor Relations Board ("NLRB") alleging, inter alia, that Akal's failure to pay the health and welfare benefits directly to the employees constituted a unilateral change in violation of § 8(a)(5) of the National Labor Relations Act. Both charges

were dismissed by the NLRB.  Plaintiff testified at her deposition that she believes Akal exerted improper influence on the NLRB or other government officials to have the complaints dismissed.

At the time the ISPU and SPFPA merged, plaintiff was an ISPU union steward. According to Akal, soon after the merger and Akal's recognition of SPFPA, plaintiff "became the self-appointed protagonist of the SPFPA."  She wrote letters to SPFPA officials, on behalf of herself and "Four State Union members," accusing them of "swindling" her out of her health and welfare money and making other demands.  Plaintiff wrote a letter dated August 16, 2004, to ISPU president Jesse Allen ("Allen"), SPFPA president David Hickey ("Hickey"), and SPFPA vice-president Bobby Jenkins ("Jenkins"), enumerating "what the union members want negotiated in the new contract."  Plaintiff lists, among other things, health and welfare allowances at the rate of $2.70 an hour, which she states should "be paid cash by the employer." She also demanded "no insurance plans nor any types of 401K plans."  On August 10, 2004, plaintiff wrote a letter to the NLRB stating that if SPFPA is misleading the members regarding the Plan, "it should be decertified as soon as possible."

In late 2004, plaintiff and two other security officers formed the Committee for Workplace Justice ("CWJ").  The CWJ published several undated newsletters that indicate that it was conducting official union business for the ISPU, including dues collection and electing ISPU officials.  One newsletter states that the CWJ is "compelling" ISPU members to pay $50 toward attorneys fees and costs in the instant lawsuit, which the newsletter states was filed by the CWJ. ISPU members are instructed to contact plaintiff, and to send checks to "Attorney Thomas Geoghegan," who is putative class counsel in the instant case.  The CWJ requested that dues be sent to ISPU and not SPFPA, stating that SPFPA was not the certified representative of the

security officers. Another newsletter states that it is produced by "ISPU Security Officers ...because of the ill conceived merger part of SPFPA Local 200."

Around the same time as the CWJ campaign, plaintiff and a few others also attempted to resurrect ISPU, which ceased to exist when it merged with SPFPA in June 2004. After plaintiff filed the instant lawsuit, she served as steward and vice-president of the new ISPU, and then president. The new ISPU demanded that Akal cease negotiating with SPFPA and negotiate with ISPU instead. Plaintiff testifed that Allen, who was president of the new ISPU in early 2005 at the time plaintiff was an ISPU steward, wanted to terminate the merger agreement. At her deposition, plaintiff denied that she sought to terminate the merger, and that the new ISPU "never got off the ground." The new ISPU also demanded that Akal stop withholding dues for SPFPA, and pay the dues to the new ISPU. Akal refused these demands, and the new ISPU filed charges with the NLRB, which were dismissed as without merit.

In Spring 2005, after the agreed certification of the Count I class, Akal and SPFPA reached a tentative agreement, subject to ratification by the membership, to divide the bargaining unit into four separate unites (Illinois, Indiana, Minnesota, and Wisconsin), with four separate local bargaining units (Locals 200, 201, 202, and 203, respectively), and four separate CBAs. According to SPFPA, each new local ratified the CBA between SPFPA and Akal in Spring 2005. At her deposition, plaintiff asserted that the Illinois unit, Local 200, did not ratify the CBA, but admits that she does not know the final vote count. Further, plaintiff's briefs appear to concede that the Local 200 CBA was in fact ratified.

Akal attaches a copy of a CBA between Akal, SPFPA, and SPFPA Local 200 (Illinois), effective April 1, 2005 (the "SPFPA CBA"), to its motion opposing class certification. SPFPA

states that each of the CBAs for the Four State Contract contains a "substantially identical provision with respect to the payment of health and welfare benefits. The Local 200 CBA was signed by Akal on June 17, 2005, and by SPFPA on June 20, 2005. It is not signed by a Local 200 representative. Appendix A to the SPFPA CBA was signed by Akal on June 6, 2005, and by SPFPA on June 20, 2005. Appendix A states, "Currently, all Health and Welfare monies are directed to a Union sponsored 401K plan. Effective October 1, 2005, all contributions will be paid in cash to employee rather than into the 401K plan."

## DISCUSSION

Fed. R. Civ. P. 23, which governs class actions, requires a two-step analysis to determine whether class certification is appropriate. First, a plaintiff must satisfy all four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Harriston v. Chicago Tribune Co., 992 F.2d 697, 703 (7th Cir. 1993). These elements are a prerequisite to certification, and failure to meet any one of them precludes certification of a class. Second, the action must also satisfy one of the conditions of Rule 23(b). Joncek v. Local 714 International Teamsters Health and Welfare Fund, 1999 WL 755051, at *2 (N.D. Ill. Sept. 3, 1999) (and cases cited therein).

A court evaluating whether a party has met its burden of proving that a class should be certified should not consider the merits of the underlying claim, Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 166 (1974), but it is appropriate to "probe behind the pleadings." General Telephone Company of Southwest v. Falcon, 457 U.S. 147, 160 (1982); see also Szabo v. Bridgeport Machines, Inc., 249 F/3d 672, 676 (7th Cir. 2001) (district court must determine actual conformance with Rule 23(a)). Plaintiff bears burden of showing that each Rule 23

requirement is satisfied by proposed class. <u>Valentino v. Howlett</u>, 528 F.2d 975, 978 (7th Cir. 1976).

In the instant case, in January 2005 a class was certified for Count I by agreement under Rule 23(b)(3). It is unclear under which section of Rule 23(b) plaintiff seeks certification of the class for Counts II, IV, V, and VI. The second amended complaint seeks certification under Rule 23(b)(3). Plaintiff's motion for class certification references 23(b)(1)(A), 23(b)(1)(B), 23(b)(2), and Rule 23(b)(3). The ambiguity, however, does not impact the instant motion because defendants' attacks on class certification and motions to decertify the Count I class address Rule 23(a) only, which is a prerequisite to certification under any subsection of Rule 23(b).

Defendants oppose certification of the class with respect to Counts II, IV, V, and VI and seek decertification of the Count I class, arguing that plaintiff is not an adequate or typical class representative. Defendants argue that subsequent to their agreement to certify the Count I class, plaintiff has amended her pleadings to include new allegations and claims that create a conflict of interest with other class members, and that her deposition testimony demonstrates that she is not an adequate class representative. In addition, SPFPA argues that plaintiff's counsel is not adequate class counsel because they participated in plaintiff's efforts to replace SPFPA with ISPU, and that the proposed class does not satisfy the commonality or typicality requirements of Rule 23(a). Akal also argues that plaintiff does not satisfy the typicality requirement because she is no longer a participant in the Plan. Defendants fail to cleanly separate their adequacy, typicality, and commonality arguments, and the issues of commonality and typicality raised by

defendants are largely subsumed in their adequacy arguments because Rule 23(a)(4) is the focus of their attack on class certification.

I.      **Adequacy of representation**

Rule 23(a)(4) requires that the named plaintiff "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy of representation requirement has three elements: (1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the named representative must have "a sufficient interest in the outcome to ensure vigorous advocacy"; and (3) counsel for the named plaintiff must be competent, experienced, qualified and generally able to conduct the proposed litigation vigorously. Gammon v. GC Services Ltd. Partnership, 162 F.R.D. 313, 317 (N.D.Ill. 1995) (citations omitted); see also Chapman v. Worldwide Asset Management, L.L.C., 2005 WL 2171168, at *4 (N.D.Ill. Aug. 30, 2005). In examining the first prong regarding antagonism and conflicts of interest, a court may consider potential conflicts that may arise as the litigation progresses. Gilpin v. American Federation of State, County, and Municipal Employees, AFL-CIO, 875 F.2d 1310, 1313 (7th Cir. 1989).

Defendants argue that plaintiff is not an adequate class representative under Rule 23(a)(4) because her interests are antagonistic to the interests of SPFPA's bargaining unit membership, who are the putative class members. Defendants' adequacy arguments fall into two general categories. First, defendants argue that plaintiff is openly disparaging of and antagonistic to SPFPA, pointing to her efforts on behalf of the CWJ and the resurrected ISPU in 2005, and highlighting her vitriol toward SPFPA. Second, defendants argue that the remedies sought by plaintiff, including striking the Plan provision from the SPFPA CBA, are in conflict with the

interests and preferences of class members who ratified the CBA and maintain Plan accounts. Defendants fail to separate their arguments regarding a class for the ERISA counts (Counts IV through VI) from arguments addressing a class for Counts I and II. The court therefore assumes that defendants oppose classes for all five counts on the same bases.

In support of defendants' first adequacy argument, defendants emphasize that after plaintiff filed the instant lawsuit in January 2004, she continued to serve as an ISPU official while ISPU sought to terminate the merger agreement and to replace SPFPA as the bargaining unit. Defendants also stress plaintiff's involvement with the CWJ, which lambasted SPFPA and urged members to reject SPFPA and continue to support ISPU. SPFPA asserts that the instant lawsuit is "part and parcel of the failed political attempt to oust the SPFPA and replace it with the [CWJ]/ISPU," and notes that the CWJ stated in a newsletter that the CWJ had filed the instant lawsuit. Akal makes a similar argument, adding that plaintiff is embroiled in a "personal grudge match against the SPFPA," and describing her deposition testimony as "irrational." The hostility between plaintiff and both defendants is plain. The relevant question under Rule 23(a)(4), however, is limited to her interests and the remedies sought in the instant case, and whether they conflict with those of putative class members here. Love v. City of Chicago, 1997 WL 120041, at *4 (N.D.Ill. Mar. 11, 1997); United Independent Flight Officers, Inc. v. United Air Lines, Inc, and Air Line Pilots Association, International, 572 F. Supp 1494, 1500 (N.D.Ill. 1983), affirmed 756 F.2d 1274 (7th Cir. 1985).

Defendants argue that plaintiff's real agenda in this case is to replace SPFPA with her union, ISPU. In support of their argument that plaintiff's dissidence and her preference for ISPU precludes her from serving as class representative, defendants cite United, in which a union

representing current and former flight deck crew members, i.e. pilots and navigators, sued the employer and the union that represented United's pilots over changes to the pilots' pension plan. Id. The district court held that the plaintiffs satisfied the first three requirements of 23(a), but failed to satisfy Rule 23(a)(4). Id. at 1500. The court identified several potential conflicts of interest, including that the plaintiff union was "somewhat" antagonistic to the defendant union, which was the collective bargaining unit of the pilots, and whose members the named plaintiffs sought to represent.

The antagonism recognized in United is distinguishable from the antagonism in the present case, at least on the current record. The antagonism identified by United was the result of the named plaintiffs' membership in a union, which was also a plaintiff, that actively sought to replace the defendant union that was the bargaining unit for the putative class members. 572 F. Supp. at 1499-1500. In addition, the district court in United noted that it is "apparent from the record that at least some class members oppose negotiation of the benefits and benefit changes that the plaintiffs seek." Id. at 15. Defendants fail to explain how plaintiff's view of SPFPA conflicts with the interests of the putative class at issue in the instant case. ISPU is no longer in existence, is not actively challenging SPFPA, and is not a plaintiff.

Moreover, plaintiff's briefs explain that her complaint "is not about the [2005] collective bargaining agreements between the SPFPA and Akal. Rather this case is about the actions SPFPA and Akal took in July 2004 when Akal took over the contract before these collective bargaining agreements were ratified." Plaintiff alleges that the individual 401(k) accounts were established in January or February 2005, and that the alleged wage and benefit underpayments

continued through September or October 2005.  Thus, plaintiff explains, her claims seek relief for defendants' conduct from July 1, 2004, through Fall 2005.

Defendants argue that the SPFPA membership's ratification of the SPFPA CBA, which included the Plan and its procedures, demonstrates that class members would oppose what plaintiff seeks in the instant lawsuit.  Defendants also point to plaintiff's admission that the attempt to resurrect the ISPU "never got off the ground" as evidence that class members are satisfied with the Plan.  Defendants' conclusory assertion that support for the SPFPA CBA and lack of support for the ISPU demonstrate approval of the Plan is not persuasive.  Unlike in United, which decided class certification on summary judgment, there is no evidence at this stage in the litigation, such as deposition testimony, of class members' opinions of the Plan, as distinct from the larger SPFPA CBA, or of the reasons for the ISPU's failure.  Speculative class conflict, such as the general antagonism identified by defendants, does not preclude class certification, at least at this stage of the litigation.  Rosario v. Livaditis, 963 F.2d 1013, 1019 (7th Cir. 1992); Love, 1997 WL 120041, at *4.

United is further distinguishable because the antagonism between the named plaintiffs and the proposed class was only one factor relied on by the district court and affirmed by the Seventh Circuit, which also considered differences between subclasses. 756 F.2d at 1284, citing 572 F. Supp at 1499-1500.  By contrast, defendants here rely almost exclusively on the antagonism between plaintiff and the SPFPA, and speculative objections by putative class members.  Although defendants describe plaintiff's misdeeds at great length, they fail to cite any authority  in support of their argument the general ill-will toward the union that represents all putative class members is a reason to find that a named plaintiff has conflicts of interest that

preclude her from being an adequate class representative. Indeed, it is not usual for a union member-plaintiff to harbor ill-will or dissident views toward the union she is suing, and she remains able to represent the interests of other union members to the extent that they are aligned. The current record does not demonstrate that plaintiff's more general acrimony and "grudge" against SPFPA are sufficient to prevent her from representing a class on the issues before the court.

Defendants' second argument, which they intersperse with their general antagonism argument, is that the injunctive remedies that plaintiff seeks are in conflict with the interests of the class. Paragraph 3 of plaintiff's second amended complaint lists the requested remedies, including "(6) injunctive relief against the maintenance of section 401(k) plan under union sponsorship." Count III alleges a violation of the § 302 of the LMRA and asks the court to: (1) declare that "the 401(k) plan established and now maintained by Akal and SPFPA to hold the health and welfare money of plaintiff and the certified class is structurally deficient in that employer and employee representatives are not 'equally represented' in important decisions"; and (2) "[e]njoin defendants to return to plaintiff or any other employee, without penalty, the health and welfare money held in the structurally deficient plan and prohibit or otherwise bar defendants from continuing to maintain the unlawful 401(k) plan." Although plaintiff does not seek to certify a class regarding Count III, her remedies would necessarily impact all SPFPA members with funds in the Plan. The ERISA claims (Counts IV, V, and VI) each seek a declaration that defendants violated ERISA by "depositing the money in an employee benefit plan in which SPFPA had an improper interest and control," and an order directing Akal and SPFPA to "pay the health and welfare benefit money directly to [plaintiff] or any other employee

rather than to an employee benefit plan in which either defendant or both have an improper interest and control."  Counts I and II do not seek any relief directly regarding the Plan.

The court notes that as of October 1, 2005, prior to the filing of the second amended complaint, Akal ceased making payments to the Plan and has since been making payments directly to the employees pursuant to the ratified CBAs.  For some reason, however, plaintiff continues in Counts IV, V, and VI to seek to enjoin defendants from contributing to "an employee benefit plan in which either defendant or both have an undue or unlawful interest." Count III seeks to require the return of the all of the funds currently held in the Plan, and to enjoin maintenance of the Plan.  In her reply brief, despite the plain injunctive language of her second amended complaint, plaintiff asserts that she is "not attempting to nullify parts of the current CBAs," including the Plan and procedures that were properly approved.  According to plaintiff, she is arguing instead that the Plan "was illegal and as a remedy class members should have the option of liquidating the plan without penalty," and that "all class members should have their underpayments made good and interest paid by Akal either directly or by an additional sum paid into the 401(k)."

The court agrees with defendants that plaintiff's argument does not track her complaint, which seeks mandatory injunctive relief and does not suggest options for employees, particularly to the extent that she seeks to "prohibit or bar defendants from continuing to maintain the allegedly  unlawful 401(k) plan."[6]  The complaint is unclear whether plaintiff seeks to enjoin the Plan entirely or simply bring it into compliance with ERISA, although her remedy language

---

[6]As discussed below, plaintiff will be required to amend her complaint once again to conform to her now-stated claims.

suggests the former.  Nevertheless, although the second amended complaint appears to seek broader relief for conduct beyond that clarified in plaintiff's class action briefs, and in fact seems to seek relief that has already been achieved by the putative class, for the reasons discussed below, the court finds that at this stage in the litigation plaintiff does not have a conflict of interest with other class members who may retain refunds in the Plan because she seeks to vindicate alleged LMRA and ERISA violations that impact all class members.  In addition, if her claims are successful, the court is not bound to impose the remedies currently sought by plaintiff, and plaintiff will be required to amend her complaint (again) to conform it to the claims articulated in her class action briefs.

Defendants also argue that plaintiff cannot represent the class because she seeks to alter the terms of a CBA that has been ratified by the SPFPA membership and to nullify the Plan. Defendants cite United in support of this argument, which is distinguishable for the reasons discussed above.

Akal also cites Wilson v. Allegheny International, Inc, 1986 WL 5201 (N.D.Ill. Apr. 25, 1986), in which the court found that the named plaintiffs did not adequately represent the putative class.  The named plaintiffs in Wilson were union members who had exercised their right to a lump sum retirement payment, while other union members chose to remain employed and forgo the lump sum option.  Id. at *2.  The plaintiffs sought reinstatement of all class members who chose to resign from their jobs, and to reinstate the lump sum option.  Id.  The defendants argued that the first remedy required laying off class members who were present employees with less seniority, and that the second remedy required cutting benefits from the current plan.  Id.  The Wilson court stated that it is "obvious that conflicts between present and

former employees exist," and held that to the extent the relief sought by the named plaintiffs would disrupt those benefits, "it is conflicting and antagonistic to class members who remained employed." Id. Akal does not apply the facts of Wilson to the instant case.

Akal also cites Campbell v. Robbins, 1992 U.S. Dist. LEXIS 8899 (N.D.Ill. June 22, 1991), which denied class certification. The plaintiffs in Campbell, however, agreed to dismiss the class claims after a study by the defendant revealed that a substantial number of class members had benefitted from an allegedly improper method of computing pension contributions. Id. at *4-5. On the current record, unlike in Wilson, it is not at all "obvious" that conflicts exist between plaintiff and class members who voted to ratify the SPFPA CBA or those who continue to maintain funds in the plan. Akal insists that because the CBAs "were negotiated and ratified by the membership," she cannot represent the class. Akal fails, however, to present any evidence that SPFPA members specifically support the Plan, other then to assert that plaintiff is one of only a small number of employees who withdrew their funds from the Plan. Unlike the defendants in Wilson and Campbell, Akal does not identify any harm likely, or even potentially, caused to class members by closing the plan, amending the SPFPA CBA to comply with ERISA, and paying class members wages and benefits that they are allegedly owed.

In Richards v. FleetBoston Financial Corp., 2006 WL 860674 (D.Conn. Mar. 31, 2006), a case not cited by any party, the court rejected a similar challenge to adequacy of representation in an ERISA case. The plaintiff in Richards alleged that the defendant's amended pension plan violated several ERISA provisions and sought certification under Rule 23(b)(2)of a class of plan participants. Id. at *1. The defendants argued that the plaintiff had interests antagonistic to those of some putative class members because the amended plan was in effect, some class

members were better off under the amended plan, and it would be improper to bind them to a non-opt-out class.[7] The Richards court held that even if the court were to accept the defendants' allegation that some class members would prefer to receive the greater benefits under the current plan, this "does not mean that the court should exclude those individuals from a class that is created to vindicate their ERISA-created rights." Id. at *4 (collecting citations). The Richards court noted that the court "is not required to impose the particular remedy requested by [plaintiff] even if she prevails on the merits of her claims." Id. at *5.

Analogously in the instant case, the fact that some class members would prefer to maintain the status quo and leave violations of the LMRA and ERISA, if they exist, unremediated does not preclude class certification. See Groover v. Michelin N. Am., Inc., 192 F.R.D. 305, 306, 307 n.1 (M.D.Ala. 2000) (the fact that some class members may be satisfied with their welfare benefits notwithstanding alleged contractual violations is not dispositive under Rule 23(a)); see also Lanner v. Wimmer, 662 F/2d 1349, 1357 (10th Cir. 1981) (holding that in putative class action challenging constitutionality of school district policy, "[i]t is not fatal if some members of the class might prefer not to have violations of their rights remedied."). Class members have no legitimate interest in a 401(k) plan that violates ERISA, which is intended to protect employees. In any event, at this stage in the litigation, the court need not decide what relief to award if plaintiff succeeds on her claims (especially as limited by plaintiff in her briefs), and class certification is not precluded by the relief she seeks.

---

[7]In the instant case, it is unclear whether plaintiff seeks certification under Rule 23(b)(2), which does not permit class members to opt out. Even if some of the classes proceed under Rule 23(b)(2), as Richards notes, class members' due process rights are protected by the court's continuing duty to assure adequacy of representation. In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1124 (7th Cir. 1979).

In addition to challenging plaintiff's adequacy, SPFPA also challenges the adequacy of class counsel, arguing that they have interests contrary to the class because they serve as counsel to the CWJ and ISPU. Plaintiff responds that counsel for plaintiff never represented the CWJ. Plaintiff admits that prior to the certification of the Count I class in July 2005, plaintiff's counsel informally advised ISPU. ISPU, however, has now dissolved, thus negating any conflict.

Accordingly, plaintiff has satisfied the adequacy prong.

## II. Typicality

Rule 23(a)(3) requires that the claims of the class representatives be typical of the class. The typicality requirement focuses primarily "on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983). Typicality is satisfied if a named plaintiff's claims arise from the same event, practice, or course of conduct that gives rise to the claims of the other class members, and the claims are based on the same legal theory. Keele v. Wexler, 149 F.3d 589, 595 (7th Cir. 1998); Kort v. Diversified Collections Services, Inc., 2001 WL 1617213, at *3 (N.D.Ill. Dec. 17, 2001).

Defendants argue that plaintiff's claims are not typical of the class because plaintiff withdrew her funds from the Plan, and is thus no longer a participant. In support of its argument that plaintiff's withdrawal of funds prevents her from satisfying the typicality prong, Akal cites Wilson, Swain, and Brengettsy v. LTV Steel Hourly Pension Plan, 241 F.3d 609 (7th Cir. 2000). Wilson and Swain address adequacy of representation only, and Brengettsy, for which Akal fails

to provide a pin cite or an explanation, does not address class certification at all.[8]  Plaintiff argues that her withdrawal of funds does not destroy typicality because she has been injured by the unlawful creation of the Plan.  In particular, plaintiff argues that class members were denied access to their health and welfare benefits from July 2004 through early 2005, and were not paid the correct amount or paid interest on the Plan funds from July 2004 through October 2005.  Plaintiff was still in the process of withdrawing her funds at the time of her deposition on April 6, 2006.  Neither defendant explains why plaintiff should be prevented from representing a class challenging the establishment, funding, and procedures of a 401(k) plan into which her health and welfare benefits were placed for a period of time, because she withdrew her funds subsequent to the alleged injury.

Similar to Akal's typicality argument, SPFPA asserts that plaintiff "now lacks standing to attack at least the continued existence of the plan as she no longer is a participant."  SPFPA fails to provide any argument or authority in support of this assertion.  Even if plaintiff does lack standing to pursue this particular remedy, the class claims do not seek this relief, and plaintiff's claims have the same essential characteristics of the class claims, as required by Rule 23(a)(3).

Akal also argues that plaintiff does not sufficiently understand her claims or her legal arguments to be an adequate class representative.  At her deposition, plaintiff testified that she "couldn't tell" whether she had received interest on the funds placed in the Plan, which is an

_____

[8]In Brengettsy, the Seventh Circuit held that the plaintiff did not have a private right of action to challenge the tax-exempt status of an ERISA plan from which he had already received full benefits.  241 F.3d at 612.  The plaintiff did not argue that he was injured by the tax exempt status, and the court noted that he would not benefit from removing the tax-exempt status.  Id.  Brengettsy does not address standing or class certification.  Even if Brengettsy is somehow relevant, unlike the plaintiff there, plaintiff in the instant case alleges that she was injured by the establishment of the Plan prior to withdrawing her money.

element of her ERISA claims, and that even if she had received interest, she would seek damages for "hardship." According to Akal, plaintiff's "total lack of understanding as to the specifics of her claim precludes a meaningful analysis of whether her claims are typical of the proposed class." In her reply brief, plaintiff argues that Akal misconstrues her deposition testimony, and cites to additional portions of her deposition. Plaintiff fails to attach the cited portions to her reply, and they are not included in the excerpts cited by defendants. Even if plaintiff was unable to explain whether she received interest, however, this does not prevent her from serving as class representative.

The Seventh Circuit has noted, "[T]he class representative's role is limited. It was found not to be enough to defeat class certification in Surowitz v. Hilton Hotel Corps., 383 U.S. 363, 366 (1966), that the named plaintiff did not understand her complaint at all, could not explain the statements in it, had little knowledge of what the lawsuit was about, did not know the defendants by name, nor even the nature of the misconduct of the defendants." Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 896 (7th Cir. 1991). Akal's argument that plaintiff's lack of knowledge regarding whether she actually received the proper amount of interest and whether she would be able to state a claim if she had received interest is therefore unavailing, although the court notes that defendants may raise the issue again if discovery indicates that plaintiff cannot represent the class as to one or more of the counts.

Akal next asserts that plaintiff "is not even a victim of many of the alleged ERISA violations about which she complains, such as the alleged choice of investment funds." Akal fails to explain this statement, and the court cannot evaluate such a conclusory assertion.

Moreover, the typicality requirement does not require that all of the claims be identical. <u>De La Fuente v. Stokely-Van Camp, Inc.</u>, 713 F.2d 225, 232 (7th Cir. 1983).

SPFPA adds that plaintiff is not typical because she is a member of Local 200, which has a CBA covering Illinois employees only, and that she claims that Local 200 did not ratify the SPFPA CBA. According to SPFPA, if plaintiff is correct that Local 200 did not ratify the SPFPA CBA, she is not typical of class members in the other three states where the CBA was ratified. Plaintiff points out in her reply brief that the second amended complaint does not allege that the SPFPA CBA was not approved by all four local unions, and that none of her claims are based on non-ratification. In addition, when plaintiff filed her initial complaint and at the time the parties agreed to certify the Count I class, which considered Local 200 to represent all bargaining unit employees working under the Four State Contract, Local 200 had not yet been split.

Plaintiff's claims are based on wages and benefits paid to all Four State Contract employees, and on a Plan established for all employees and that was ratified in materially identical provisions of the SPFPA CBA agreed to by each local. SPFPA fails to identify how the subsequent division of Local 200 and the existence of four separate CBAs renders plaintiff's claims not sufficiently typical. It is disingenuous for SPFPA to argue that because defendants subsequently agreed to split up Local 200, plaintiff lacks typicality. It is clear from her complaints that plaintiff has always intended to represent all bargaining unit employees under the Four State Contract, and she clarifies that she does not challenge the ratification of the SPFPA CBA, which further demonstrates that the later split of the locals is irrelevant to her case.

The claims of plaintiff and the putative class members arise from the same events or course of conduct, namely defendants' alleged failure to pay the proper amount of wages and health and welfare benefits, and failing to pay employees directly, from July 1, 2004, through September 2005. Plaintiff also claims that all class members were denied access to their health and welfare benefits from July 1, 2004, through January or February 2005, when the individual 401(k) plans were established. The class claims are based on the same legal theories about how this conduct violated the LMRA and ERISA. Accordingly, plaintiff has satisfied the typicality prong.

## III. Commonality

SPFPA attacks the commonality element, but its arguments merely repeat its typicality arguments regarding plaintiff's membership in Local 200 and her testimony questioning ratification. "A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)." <u>Rosario v. Livaditis</u>, 963 F.2d 1013, 1018 (7th Cir. 1992), cert. denied 506 U.S. 1051 (1993). The presence of some factual variation among class members' experiences will not defeat class certification. <u>Id.</u> at 1017. A plaintiff need only show that there is at least one question of fact common to the class to satisfy the commonality requirement. <u>Portis v. City of Chicago</u>, 2003 WL 22078279, at *2 (N.D.Ill. Sept. 8, 2003); <u>In re VMS Sec. Litig</u>, 136 F.R.D. 466, 473 (N.D.Ill. 1991).

As discussed above, plaintiff's allegations and the putative class allegations, which all arise from the same conduct by defendants, share a common nucleus of operative facts. Accordingly, plaintiff has satisfied the commonality prong.

Defendants do not challenge the numerosity prong.  Accordingly, the court grants plaintiff's motion to certify a class as to Counts II, IV, V, and VI of the second amended complaint.

**IV.     Motion to decertify the Count I class**

Defendants have moved to decertify the Count I class, which this court certified by agreement on July 11, 2005.  Class notice has been sent, and the opt-out date has passed. Defendants largely repeat their class certification arguments in support of their motion to decertify, and plaintiff relies on her arguments in favoring of class certification, adding only that the motion to decertify is belated.  The court rejects defendants' arguments opposing class certification, as discussed above.  Accordingly, the court denies defendants' motion to decertify the Count I class, although a new class notice must be approved and sent.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for class certification is granted as to Counts II, IV, V, and VI.  However, because plaintiff has narrowed her claims to the period from July 1, 2004, through September or October 2005, **at the latest,** the class definition, as well as the complaint, must be amended.  Accordingly, plaintiff is directed to submit a third amended complaint containing a properly defined class[9] on or before July 11, 2006.  The parties are directed to appear before the court on July 18, 2006, at 9:30 a.m. to discuss the status of this litigation.  The July 11, 2006, status conference is cancelled.

**ENTER:        June 21, 2006**

_____
**Robert W. Gettleman**
**United States District Judge**

---

[9]For example, the class should include only employees employed after July 1, 2004, and prior to the end of the alleged wrongdoing in 2005.