IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARRIE UPSHAW, on behalf of herself and others similarly situated, ) ) ) Plaintiff, ) v. ) ) AKAL SECURITY, INC., and SECURITY ) POLICE AND FIRE PROFESSIONALS OF ) AMERICA, ) ) Defendants. ) | No. 05 C 0-272 Judge Robert W. Gettleman |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Carrie Upshaw filed a six-count[1] third amended class action complaint against defendants Akal Security, Inc. ("Akal") and Security Police and Fire Professionals of America ("SPFPA"), seeking unpaid wages and health and welfare benefits.[2] Count I alleges that defendant Akal wrongfully withheld wages and health and welfare benefits in violation of § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Count II alleges a quantum meruit claim in the alternative. Count III alleges that the 401(k) plan into which defendant Akal deposited money for plaintiff and other class members is structurally deficient because employer and employee representatives are not "equally represented" in important

---

[1] In her memorandum supporting their motion for summary judgment, plaintiff states that she no longer intends to pursue Count IV. The court therefore dismisses Count IV with prejudice.

[2] Despite this court's admonishment in its opinion of June 21, 2006 (Upshaw v. Akal, unpub., 05 C 272 (N.D. Ill. June 21, 2006)), plaintiff has failed to clarify her complaint as to which claims are brought against each defendant. It appears from the summary judgment briefs, however, that the only claim pending against defendant SPFPA is Count I, and the court will rule under that assumption.

decisions regarding the management of the plan, in violation of § 302(c)(5) of the LMRA. Counts V and VI allege violations of § 404 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1104 and 1105, based on the establishment and maintenance of the 401(k) plan and on defendants' failure to pay health and welfare benefits directly to employees. All parties have filed motions for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons discussed below, the court denies plaintiff's motion for summary judgment. Defendant SPFPA's and defendant Akal's motions for summary judgment are granted.

## **FACTS**[3]

Plaintiff is a resident of Illinois and an employee of defendant Akal. Akal employs security guards working at federal office buildings in Illinois, Indiana, Wisconsin, and Minnesota. Defendant SPFPA is a labor organization representing plaintiff and other security guards in the same four states.

Original Four-State Contract

Prior to July 1, 2004, plaintiff and other class members were employees of the General Security Services Company ("GSSC"), which held a service contract (the "Four-State Contract") with the Federal Protective Service ("FPS") to provide security services and personnel at various federal facilities in Illinois, Indiana, Wisconsin, and Minnesota. The Four-State Contract was

---

[3] The following facts are taken from the parties' L.R. 56.1 statements and the accompanying exhibits unless otherwise noted.

2

governed by the Service Contract Act ("SCA"), 41 U.S.C. § 351 et seq., which requires contractors to pay their employees "prevailing wages and benefits."

Plaintiff and other class members were also members of the Independent Security Police Union ("ISPU"), which had a collective bargaining agreement ("CBA") with GSSC effective from October 1, 2000, to September 30, 2003 ("2000-03 CBA"). Under the CBA, GSSC paid its bargaining members an hourly wage ranging from $14.00 to $15.95 per hour, depending on job classification and work location, and a $2.30-per-hour health and welfare benefit. The 2000-03 CBA stated that GSSC could, at its discretion, pay the health and welfare benefit directly in cash to employees' paychecks or to a employer- or union-sponsored health care plan. GSSC opted to pay the $2.30 per hour benefit in cash directly to employees' paychecks.

On June 10, 2003, the ISPU and GSSC signed a new collective bargaining agreement for 2003-05 ("2003-05 CBA"). That CBA eliminated GSSC's discretion to pay the health and welfare benefit to a health care plan and instead required GSSC to make payments directly to employees' paychecks. The CBA also included higher hourly wages to be paid to employees, as well as a $2.70-per-hour health and welfare benefit payment, rather than $2.30. Although the 2003-05 CBA stated that it would become effective on October 2, 3003, GSSC did not implement the majority of the terms included in the 2003-05 CBA. At no point before GSSC's contract expired on June 30, 2004 did it raise employees' hourly wages to those specified in the 2003-05 CBA or raise the health and welfare benefit to $2.70 per hour, paying that benefit only at the $2.30 per hour rate. GSSC did begin, however, paying the health and welfare benefit directly to employees' paychecks, as it had discretion to do under the 2000-03 CBA, the last CBA in place.

3

Defendant Akal Bids for Four-State Contract

In early 2003, FPS sought bids for the Four-State Contract served by GSSC by issuing a Request For Quotes ("RFQ"). Shortly thereafter, FPS issued an amendment to the RFQ to include the 2000-03 CBA between GSSC and the ISPU. RFQs typically include the CBA governing the existing contract because successor contractors are required under § 353 of the SCA, 41 U.S.C. § 353, to pay at a minimum the wages and benefits set forth in the CBA already in place.[4]

Defendant Akal submitted its initial bid to FPS in March 2003, based on information included in the RFQ, including the 2000-03 CBA. GSSC also submitted a bid to the FPS. GSSC later attempted to supplement its bid with pricing from the negotiated 2003-05 CBA, but FPS refused to accept the supplemented bid because it was submitted after the bid deadline. At no point did FPS provide bidders with the 2003-05 CBA or inform bidders of its contents. In February 2004, Akal placed its final bid for the Four-State Contract. FPS awarded the contract to defendant Akal in March 2004.

---

[4]Section 353 provides: "No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's-length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract."

Wage and Benefits Dispute

In June 2004, before Akal assumed the duties of the Four-State Contract, the members of the ISPU voted to merge with defendant SPFPA. As a result of that merger, the members of the ISPU became members of the SPFPA Local 200, and defendant SPFPA became the collective bargaining representative of the employees covered by the Four-State Contract.

On or about June 7, 2004, SPFPA Vice President Bobby Jenkins ("Jenkins") called Janet Gunn ("Gunn"), Director of Human Resources and Labor Relations for defendant Akal, to request negotiations between Akal and SPFPA for a new CBA governing the employees under the Four-State Contract. According to plaintiff, Gunn told Jenkins that she thought Akal could adopt the negotiated 2003-05 CBA between ISPU and GSSC as the CBA between Akal and SPFPA. Also on or about June 7, 2004, Gunn asked a SPFPA representative for a copy of the negotiated 2003-05 CBA.

On July 1, 2004, Akal began operations under the Four-State Contract, employing plaintiff and approximately ninety-eight percent of the former GSSC employees who had worked under the prior contract. Akal began paying employees the hourly wages set out in the 2000-03 CBA, not the higher wages set out in the 2003-05 CBA.

Akal also informed employees that it would no longer pay health and welfare benefits directly to employees, but instead contribute the health and welfare payments to a benefit plan sponsored by SPFPA. Gunn had learned on June 30, 2004, that GSSC had previously paid the health and welfare benefit directly to employees' paychecks instead of depositing it into a plan. Akal, however, had placed its bid for the Four-State Contract with the intention of terminating

5

the direct payment to employees to avoid paying payroll taxes on the health and welfare benefit payments.

On July 13, 2004, SPFPA stated that Akal should pay the health and welfare benefit directly to employees in the form of cash, which Akal refused to do. On July 23, 2004, Akal mailed a check for the health and welfare payments due to employees, totaling more than $100,000, to the administrator of SPFPA's Retirement Plan, a multi-employer benefit plan overseen by an equal number of union-appointed and employer-appointed trustees (the "Plan"). The Plan had been established on January 8, 2004. On August 6, 2004, Gunn issued a memo to employees indicating that Akal had sent their health and welfare benefit payments to the Plan. The memo also stated that under the 2000-03 CBA Akal could elect to pay the health and welfare benefit directly to employees or into a health insurance plan. On August 19, 2004, SPFPA returned Akal's check, stating that SPFPA and Akal had not reached an agreement as to how the money should be handled.

Negotiations for New CBA

Also on August 19, 2004, Akal and SPFPA began negotiations for a new CBA for employees working under the Four-State Contract. Plaintiff was present at the negotiations as an observer, but not as a member of the bargaining committee, which consisted of bargaining unit members from each of the four states governed by the Four-State Contract. That day, the bargaining committee voted unanimously that Akal would temporarily contribute the health and welfare benefit payments into the Plan. On September 1, 2004, Gunn signed a Participation

Agreement on behalf of Akal agreeing to comply with the Plan's terms, with an effective date retroactive to July 1, 2004.

Beginning in September 2004, Akal sent health and welfare benefit payment checks to Transamerica, the Plan's administrator, including a deposit to cover payments retroactive to July 1, 2004. Transamerica had delays in establishing individual accounts for those health and welfare payments, but during those delays Transamerica deposited Akal's payments into an interest-bearing account. In January 2005, the Plan established individual accounts for each member of the bargaining unit and funded each account back to July 1, 2004. According to plaintiff, employees could not access their money until February 2005, and they could not withdraw funds without paying large penalty fees imposed by the Internal Revenue Code. Plaintiff and other class members have withdrawn or are currently withdrawing all funds from the Plan.

In early 2005, Akal and SPFPA reached agreement on the terms of four new CBAs, one for each state under the Four-State Contract (collectively, the "2005 CBA"), effective from April 1, 2005, to September 30, 2007. The 2005 CBA provided new wage rates effective October 1, 2005. It also provided that the health and welfare benefit would be paid to the Plan until October 1, 2005, at which point it would be paid directly to employees' paychecks.

Actions Taken by Defendant SPFPA

On September 10, 2004, SPFPA's counsel wrote to Gunn, alleging that Akal's failure to pay the health and welfare benefit directly to employees was a unilateral change in terms and

conditions of employment in violation of the NLRA. SPFPA claimed that Akal was required to continue GSSC's practice as an existing term of employment that could not be changed unilaterally without first bargaining with the union. After discussions failed to resolve the dispute, SPFPA filed unfair labor practices against Akal in four regional offices of the National Labor Relations Board ("NLRB"), alleging that Akal unilaterally changed terms and conditions of employment by paying the health and welfare benefit to a plan instead of directly to employees as GSSC had done. On January 27, 2005, the NLRB'S Office of the General Counsel issued an Advice Memorandum directing the regional offices to dismiss the unfair labor practice charges filed against Akal by SPFPA. The Memorandum stated that the NLRB had reached no decision concerning the impropriety of Akal's actions. According to plaintiff, defendant Akal exerted improper influence on the NLRB to have the charges dismissed.

In September 2004, SPFPA filed a request for an investigation with the Department of Labor ("DOL"), claiming that Akal was paying below the minimum Area Wage Determination ("AWD") standards set by the DOL for hourly wages and health and welfare benefits. In September 2005, the DOL investigation determined that the RFQ should have used AWD determinations to set the hourly wage and benefit payments required under the Four-State Contract. For that reason, the DOL directed Akal to pay all affected employees the rates under the modified Four-State Contract, which were effective from July 1, 2004, through September 30, 2005, after which time the rates in the 2005 CBA took effect. On September 16, 2005, Akal sent a letter to all affected employees stating that any employee earning less than the AWD rate as of July 1, 2004, would receive retroactive pay. Akal made the required payments in May 2006, but it did not pay interest on the retroactive payments.

**DISCUSSION**

All parties have filed motions for summary judgment. Under Fed. R. Civ. P. 56(c), a court should grant a motion for summary judgment if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of material fact. See Celotrex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). When reviewing a summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994).

Count I: LMRA

Count I of the complaint is a claim under § 301 of the LMRA, which allows lawsuits brought by and against labor unions for violations of contracts between the employer and the union representing the employees. In general, only a union may enforce a CBA on behalf of its employees. See, e.g., Ooley v. Schwitzer Div., Household Mfg., Inc., 961 F.2d 1293, 1297-98 (7th Cir. 2002). An employee may, however, bring a claim herself under 301 if she both sues the union for breach of its duty of fair representation and sues her employer for breach of the CBA. DelCostello v. Teamsters, 462 U.S. 151, 164-65 (1983).

9

Plaintiff has attempted to circumvent the requirements of § 301 in two ways. First, plaintiff has informed the court that she seeks summary judgment only on the issue of defendant Akal's liability, and will pursue her claim against defendant SPFPA for breach of its duty of fair representation only if the case proceeds to trial. Unfortunately, plaintiff does not have the option of deciding if and when a jury hears her claims. If plaintiff wishes to move for summary judgment on her § 301 claim, she must do so as required by the statute.

Plaintiff next argues that because both Akal and SPFPA agreed that she is a legally adequate representative of all bargaining unit members, she is the "legal equivalent of the bargaining unit itself" under Fed. R. Civ. P. 23 and may therefore "proceed directly against Akal without proving a breach of SPFPA's duty of fair representation." As defendant Akal notes, plaintiff provides no legal support whatever for this assertion. It appears that plaintiff is confused as to the difference between the role of a class representative under Fed. R. Civ. P. 23 and the role of a collective bargaining unit as a representative of its members. The two positions are not interchangeable, and plaintiff's status as class representative in no way waives the requirement that she sue the union under § 301. Plaintiff must therefore prove both a breach of SPFPA's duty of fair representation and a breach of the CBA by Akal to prevail on Count I of her complaint.

*SPFPA's Duty of Fair Representation*

To establish that defendant SPFPA breached its duty of fair representation, plaintiff must demonstrate that its actions were arbitrary, discriminatory, or taken in bad faith. Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 67 (1991). A union's actions are arbitrary only if "the union's

Plaintiff has attempted to circumvent the requirements of § 301 in two ways. First, plaintiff has informed the court that she seeks summary judgment only on the issue of defendant Akal's liability, and will pursue her claim against defendant SPFPA for breach of its duty of fair representation only if the case proceeds to trial. Unfortunately, plaintiff does not have the option of deciding if and when a jury hears her claims. If plaintiff wishes to move for summary judgment on her § 301 claim, she must do so as required by the statute.

Plaintiff next argues that because both Akal and SPFPA agreed that she is a legally adequate representative of all bargaining unit members, she is the "legal equivalent of the bargaining unit itself" under Fed. R. Civ. P. 23 and may therefore "proceed directly against Akal without proving a breach of SPFPA's duty of fair representation." As defendant Akal notes, plaintiff provides no legal support whatever for this assertion. It appears that plaintiff is confused as to the difference between the role of a class representative under Fed. R. Civ. P. 23 and the role of a collective bargaining unit as a representative of its members. The two positions are not interchangeable, and plaintiff's status as class representative in no way waives the requirement that she sue the union under § 301. Plaintiff must therefore prove both a breach of SPFPA's duty of fair representation and a breach of the CBA by Akal to prevail on Count I of her complaint.

*SPFPA's Duty of Fair Representation*

To establish that defendant SPFPA breached its duty of fair representation, plaintiff must demonstrate that its actions were arbitrary, discriminatory, or taken in bad faith. Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 67 (1991). A union's actions are arbitrary only if "the union's

behavior is so far outside a wide range of reasonableness as to be irrational." Id. The standard is extremely deferential; plaintiff's burden is "not just to establish that [her] position is as plausible as the union's, but to show that the union's position could eventually be deemed not even colorable." Trnka v. Local 688, UAW, 30 F.3d 60, 61 (7th Cir. 1994). To establish that SPFPA's actions were discriminatory or taken in bad faith, plaintiff must establish both subjective hostility toward her as an individual or a member of a disfavored group and evidence that that hostility negatively impacted the union's representation. Souter v. Int'l Union, UAW, 993 F.2d 595, 598 (7th Cir. 1993).

Plaintiff claims that defendant SPFPA violated its duty of fair representation in two ways: (1) "not ensuring the proper payment of the wages and health and welfare benefits," and (2) "conspiring with or acquiescing in the employer Akal's failure to pay such wages and benefits until it could induce Akal to give the health and welfare money to a third party sponsored by or affiliated with the union." As for the first portion of the claim, plaintiff argues in her response brief that defendant SPFPA failed to "file suit" for the wages and benefits due to class members. As defendant SPFPA points out, plaintiff never specifies what sort of "suit" she would have liked the union to bring. SPFPA did, however, file a claim with the NLRB seeking the direct payment of the health and welfare benefit to employees. When that claim was dismissed, SPFPA then appealed it to the NLRB's General Counsel. Similarly, defendant SPFPA requested an investigation by the DOL regarding the dispute over hourly wages, and as a result of that investigation, the DOL directed defendant Akal to pay retroactive wages to employees. Finally, while pursuing all available legal avenues, SPFPA negotiated a new CBA

with Akal that required Akal to pay the health and welfare benefit directly to employees after October 1, 2005, and the CBA was ratified by the union.

As for the second portion of plaintiff's claim, she asserts that defendant SPFPA "conspired" with defendant Akal not to pay the health and welfare benefits directly to employees. There is simply no evidence to support this assertion. When Akal chose to terminate those direct payments, the union objected immediately, and it followed those objections with the NLRB charges discussed above. The union then bargained with Akal to end the payment of the health and welfare benefit to the Plan as of October 1, 2005. Finally, there is no evidence that the union benefitted in any way from the depositing of the health and welfare benefit payments into its Plan; all funds went, after an initial administrative delay, into individual accounts for each employee.

Plaintiff has not presented any evidence that defendant SPFPA's actions were in any way arbitrary. Indeed, the union took what appear to be all possible efforts on behalf of its members, many of which achieved precisely the result sought by plaintiff. Plaintiff has also not identified any way in which defendant SPFPA's actions were discriminatory or taken in bad faith. For that reason, the court finds that the uncontested facts demonstrate that defendant SPFPA did not breach its duty of fair representation, and it grants SPFPA's motion for summary judgment as to Count I.

*Contract Between Akal and SPFPA*

Even assuming that plaintiff could demonstrate a breach of SPFPA's duty of fair representation, she must still establish defendant Akal's breach of contract to prevail on Count I

12

of her complaint. Plaintiff claims that under the SCA, Akal was required to pay the hourly wages and health and welfare benefit set forth in the CBA governing the Four-State Contract before Akal began operations on July 1, 2004. According to plaintiff, the CBA in place as of that date was the 2003-05 CBA, which provided for direct payments to employees of $2.70 per hour in health and welfare benefit payments, as well as hourly wages higher than those set forth in the 2000-03 CBA.

Plaintiff is correct that Akal was required to maintain the wage and benefit payment rates paid under the existing CBA between GSSC and ISPU as a "successor contractor" to the Four-State Contract. See, e.g., EG&G Florida, Inc., 279 NLRB 444 (1986).[5] Plaintiff's argument that Akal was required to pay the rates set forth in the 2003-05 CBA, however, fails for the simple reason that the 2003-05 CBA was never implemented, a fact she does not dispute. At no point prior to July 1, 2004, did GSSC ever raise hourly wages above those established by the 2000-03 CBA, and at no point did GSSC pay its employees $2.70 per hour in health and welfare benefit payments. As discussed below, GSSC was not even paying its employees the AWD minimum of $2.49 per hour in health and welfare benefits. The fact that GSSC, under its discretion as provided for in the 2000-03 CBA, had decided to pay that health and welfare benefit directly to employees does not prove the implementation of the 2003-05 CBA. Defendant Akal was under

---

[5] Defendant Akal centers its argument around the principle that as a successor employer, it was free to adopt the predecessor's CBA or establish its own terms and conditions of employment, "without regard to the terms and conditions established by its predecessor." Akal's Reply Memorandum in Support of Its Motion for Summary Judgment, p. 8, citing NLRB v. Burns Inter. Security Servs., Inc., 406 U.S. 272 (1972). While defendant's assertion is technically correct, it ignores the fact that it was required to pay the wage and benefit rates established by its predecessor under the SCA.

no obligation to honor the wage and benefit rates of a CBA that was never implemented. Akal's responsibility as a successor contractor was to pay the rates in the 2000-03 CBA, which it did.

Plaintiff attempts to salvage her claim by arguing that defendant Akal was aware of the existence of the 2003-05 CBA, which had been negotiated between GSSC and the ISPU, prior to the merger with the SPFPA.[6] Akal does not dispute that Janet Gunn was aware of the document's existence and had considered "signing off on it." Akal, however, chose not to do so, and it was within its rights to decide against a CBA that had been negotiated by a different employer and a different union. Further, plaintiff cannot dispute that when soliciting bids for the Four-State Contract, FPS did not attach the 2003-05 CBA to the RFQ or provide it to potential bidders at any point during the bidding process. Plaintiff has thus failed to establish that Akal was required to adhere to wage and benefit rates of a CBA that was never implemented.

Finally, plaintiff claims that Akal was required to pay its employees the higher of two rates: the AWD rate established by the DOL, or the rates established in the 2000-03 CBA. Defendant does not dispute that it was required to pay, at a minimum, the AWD rates. For this specific reason, defendant Akal made retroactive payments to employees in May 2006 to compensate for the difference between their hourly wages and the AWD rates, as directed by the DOL. Plaintiff claims that these retroactive payments did not include interest, but the DOL did

---

[6] Plaintiff also argues that defendant Akal is somehow bound by the 2003-05 CBA as an "implied-in-fact CBA" because it was "mistaken" when it adopted the hourly wage and benefit rates in the 2000-03 CBA, rather than the 2003-05 CBA. Plaintiff misstates the law. "Implied-in-fact CBAs" refer to situations in which parties have agreed to the terms of an agreement and demonstrate "conduct manifesting an intention to abide by and be bound by" its terms, but have not yet reduced the agreement to writing. See, e.g., Capitol-Husting Co. v. NLRB, 671 F.2d 237, 243 (7th Cir. 1982). In the instant case, Akal was not a party to the negotiation of the 2003-05 CBA and never agreed to abide by or be bound by its terms.

14

not require interest when directing Akal to make these payments. Similarly, plaintiff claims that Akal breached the CBA by not paying AWD-specified health and benefit rates. Once again, defendant Akal made retroactive payments to compensate employees and negotiated health and welfare benefit payments in the new CBA with SPFPA.

Because Akal has already compensated plaintiff and other class members for the discrepancy between the rates set forth in the 2000-03 CBA and those required by the DOL, this portion of plaintiff's claim is moot. Further, because plaintiff cannot establish either a breach of SPFPA's duty of fair representation or Akal's breach of the CBA, the court grants summary judgment to defendants as to Count I.

Count II

In Count II, an alternative to Count I, plaintiff claims that she and other class members are entitled to the reasonable value of their services in the form of wages and benefit payments. According to plaintiff, that amount should not be the AWD rates, as discussed above, but instead those rates set forth in the 2003-05 CBA. Plaintiff has provided no support for this assertion or any explanation as to why the AWD rates are not reasonable. As discussed above, defendant Akal has already compensated plaintiff and other class members for any discrepancy between their wages and those required by the DOL. For that reason, plaintiff's claim is moot, and the court grants Akal's motion for summary judgment as to Count II.

Count III

Count III of the complaint alleges that defendant Akal's contributions to the Plan, as discussed above, violate § 302 of the LMRA because the Plan was "structurally deficient." According to plaintiff, employer and employee representatives were not "equally represented" with respect to important decisions regarding the Plan's management. Additionally, in plaintiff's motion for summary judgment, she argues that Akal's contributions violated § 302 because there was no plan in existence at the time the contributions were made, and Akal commingled its contributions with other corporate funds. Plaintiff seeks an order enjoining Akal from making further contributions to the Plan and requiring Akal to return to plaintiff and other class members the deposits previously contributed to the Plan.

Section 302(a) of the LMRA provides that it is unlawful for any employer to pay, lend, deliver or agree to pay, lend, or deliver any money or other thing of value to any employee representative or labor organization. 29 U.S.C. § 186(a). Section 302(a)(5) creates an exception, however, for monetary payments to a trust fund established by such a representative or labor organization for the benefit of employees, provided that: (1) such payments are held in trust for the purpose of paying employee benefits; (2) the basis on which the payments are made is set forth in a written agreement; (3) participating employees and employers are equally represented in the administration of such fund; and (4) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust that provides that the funds held therein cannot be used for any purpose other than paying such pension or annuities. 29 U.S.C. § 186(c)(5).

Despite plaintiff's assertions, the Plan does represent participating employees and employers equally, and it does not appear that the Plan at any point commingled deposits from Akal with any other corporate funds. The Plan also held payments in trust to pay employee benefits and did not include any payments for pensions or annuities. Plaintiff is correct, though, that as of July 1, 2004, the basis on which payments to the Plan were made had not been reduced to a written agreement. That Participation Agreement, although retroactive to July 1, 2004, was not executed until September 1, 2004. Under 29 C.F.R. § 2510.3-102, an employer that withholds portions of employees' paychecks has fifteen days "following the month in which such amounts would otherwise have been payable to the participant (in the case of amounts withheld by an employer from a participant's wages)," in which to deposit the sums into a valid account. Because Akal withheld funds in July 2004, it was required to deposit those funds into an account during August 2004. When Akal mailed a check to SPFPA in early August 2004, SPFPA returned the check, specifically because no agreement had been reached as to how to deal with the health and welfare benefit payments. For that reason, the court finds that defendant Akal did violate § 302 when it ceased paying the health and welfare benefit directly to employees' paychecks on July 1, 2004.

As defendant Akal notes, however, the relief sought by plaintiff is both moot and unavailable. Plaintiff first seeks an order prohibiting Akal from depositing future contributions into the Plan. As plaintiffs well know, Akal ceased its contributions to the Plan as of October 1, 2005, and has been making payments directly to employees' paychecks since that date. Such relief is therefore moot. Plaintiff also seeks restitution of the contributions made to the Plan between July 1, 2004, and September 31, 2005. As defendant Akal correctly asserts, "Every

17

court which has addressed the question whether section § 302(e) of the LMRA authorizes a civil action for the return of pension contributions made in violation of § 302 has held that no such cause of action exists." Rochetti v. American Federation of Musicians' & Employers' Pension Welfare Fund, 1987 WL 12767, *3 (N.D. Ill. Aug. 13, 1987); see also Chicago Regional Council of Carpenters Pension Fund v. Three Way Hanging, Inc., 2008 WL 192989, *4 (N.D. Ill. Jan. 22, 2008). The court agrees with these cases, and thus holds that the remaining relief sought by plaintiff is unavailable. Defendant Akal's motion for summary judgment as to Count III is granted.

Counts V and VI

Count V of the complaint alleges that defendant Akal breached its fiduciary duty in violation of § 404 of ERISA, 29 U.S.C. § 1104, by making health and welfare benefit payments to the Plan instead of directly to employees. According to plaintiff, Akal failed to act "solely in the interest of the participant and beneficiaries" and failed to use "plan assets" "for the exclusive purpose of providing benefits to participants [class members] and their beneficiaries." Count VI alleges a breach of fiduciary duty by Akal as a co-fiduciary in violation of § 1105 of ERISA, 29 U.S.C. § 1105, by not providing individualized account information to the Plan administrator when the Plan was established in September 2004. For both claims, plaintiff seeks a declaration that Akal breached its fiduciary duties and recovery of money by individual class members.

For claims of breach of fiduciary duty under ERISA, plaintiff has only two available options: (1) an action for recovery of money on behalf of the Plan under § 502(a)(2); or (2) an action for equitable relief under § 502(a)(3). Claims under § 502(a)(2) can be brought by plan

participants in a representative capacity only "on behalf of the plan as a whole." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 (1985). In the instant case, plaintiff has not asserted a claim on behalf of the Plan. Instead, plaintiff seeks payment directly to individual class members. Plaintiff has therefore not stated a claim under § 502(a)(2).

Section 502(a)(3) can be used only to obtain "equitable relief," not compensatory damages. Sereoff v. Mid Atl. Med. Servs. Inc., 126 S. Ct. 1869, 1873-74 (2006). Despite plaintiff's attempt to categorize the money she seeks as an "accounting for profits," the request is actually solely for compensatory damages. Even if plaintiff had sought equitable relief, it is available only when there is no other adequate remedy at law. See, e.g., Hackett v. Xerox Corp. Long-Term Disability Income Plan, 177 F. Supp. 2d 803, 829 (N.D. Ill. Dec. 13, 2001) (rev'd on other grounds). Plaintiff has other adequate legal remedies, including a claim on behalf of the Plan itself, as discussed above, but she has not availed herself of these options. Because the relief plaintiff seeks is not available, the court grants defendant Akal's motion for summary judgment as to Counts V and VI.

## CONCLUSION

For the reasons discussed above, plaintiff's motion for summary judgment is denied and defendant SPFPA's and defendant Akal's motions for summary judgment are granted.

**ENTER:** **March 20, 2008**

_____
**Robert W. Gettleman**
**United States District Judge**